Filed 12/21/21  P. v. Anderson CA2/2
Modification of opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANDERSON,<br><br>Defendant and Appellant. | B282048<br><br>(Los Angeles County<br>Super. Ct. No. TA138556)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING [CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on December 17, 2021, be modified as follows:

1.  On page 4, the following is added as the last sentence of footnote 5:  On remand, the trial court may exercise its expanded sentencing discretion under section 654 as amended by Assembly Bill No. 518 (2021–2022 Reg. Sess., eff. Jan. 1, 2022).

2. On page 4, the last sentence of the first paragraph is changed to read: We affirm the judgment of conviction and remand with directions that the trial court exercise its discretion with respect to the imposition of the firearm enhancement under section 12022.53 and to reconsider which sentences to stay pursuant to section 654 as amended by Assembly Bill No. 518.

3. On page 29, Heading V is modified to read:

**V. In Light of Senate Bill No. 620 and Assembly Bill No. 518, the Matter Must Be Remanded to Enable the Trial Court to Exercise Its Discretion to Impose or Strike the Firearm Enhancements and to Reconsider the Counts on Which to Stay the Sentence**

4. On page 31, the following paragraph is added before the Disposition:

In a supplemental brief filed November 21, 2021, appellant contends that Assembly Bill No. 518, which amends section 654, will apply retroactively when it becomes effective on January 1, 2022. (*People v. Frahs* (2020) 9 Cal.5th 618, 629 [*Estrada* rule of retroactivity applies to statutory changes that merely make a reduced punishment possible].) As amended, section 654 affords trial courts increased sentencing discretion to determine which sentences to stay. Although the amendment to section 654 is not yet effective, by the time the matter comes before the trial court to exercise its discretion with respect to the firearm enhancements under section 12022.53, subdivision (h), Assembly Bill No. 518 will have gone into effect. Accordingly, on remand,

2

the trial court may exercise its expanded sentencing discretion under section 654 as amended by Assembly Bill No. 518.

5.  On page 31, the second sentence of the Disposition is modified to read:  The matter is remanded with directions that the trial court exercise its discretion with respect to imposition of the firearm enhancement under Penal Code section 12022.53, and to reconsider which sentences should be stayed under Penal Code section 654.

This modification changes the judgment.
Appellant Robert Anderson's petition for rehearing is denied.

LUI, P. J.            CHAVEZ, J.            HOFFSTADT, J.

Filed 12/17/21  P. v. Anderson CA2/2 (unmodified opinion)
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANDERSON,<br><br>Defendant and Appellant. | B282048<br><br>(Los Angeles County<br>Super. Ct. No. TA138556) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Tammy Chung Ryu, Judge.  Affirmed in part and remanded with directions.

Mark R. Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Robert Anderson appealed the judgment entered following a jury trial in which he was convicted of two counts of attempted premeditated murder (Pen. Code,[1] §§ 187, subd. (a)/664; count 1, Tony Rivas, & count 4, Carlos Manzur); two counts of shooting at an occupied motor vehicle (§ 246; counts 2 & 3); conspiracy to commit a crime (dissuading a witness) (§§ 182, subd. (a)(1), 136.1, subd. (a); count 5); and attempting to dissuade a witness (§ 136.1, subd. (a)(2); count 6). As to both attempted murders the jury found true the allegations that appellant had personally used a firearm (§ 12022.53, subd. (b)) and personally discharged a firearm (§ 12022.53, subd. (c)). With respect to the attempted murder in count 1, the jury also found true the allegation that the personal and intentional discharge of a weapon caused great bodily injury to Rivas. (§ 12022.53, subd. (d).) The trial court sentenced appellant to an indeterminate term of 55 years to life plus a consecutive determinate term of 21 years and 8 months.

We affirmed the judgment of conviction in an unpublished opinion on September 30, 2019.[2] Our Supreme Court granted review and subsequently transferred the matter to this court with directions to vacate the prior decision and to reconsider the cause in light of *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). (Cal. Rules of Court, rule 8.528(d).) In *Lemcke*, our Supreme Court undertook an examination of CALCRIM No. 315[3] to resolve

---

[1] Undesignated statutory references are to the Penal Code.

[2] *People v. Anderson* (Sept. 30, 2019, B282048) [nonpub. opn.] (*Anderson I*).

[3] CALCRIM No. 315 instructs in relevant part:

2

the following question: " 'Does instructing a jury with CALCRIM No. 315, which directs the jury to consider an eyewitness's level of certainty when evaluating an identification, violate a defendant's federal and state due process rights?' " (*Lemcke*, at pp. 653–654.) While finding no due process violation on the record before it, *Lemcke* "join[ed] other jurisdictions (and the California Commission on the Fair Administration of Justice) in acknowledging that [inclusion of the certainty factor in CALCRIM No. 315] has the potential to mislead jurors." (*Lemcke,* at p. 665.)

On remand, appellant contends that our Supreme Court's concerns in *Lemcke* about the potential risks presented by inclusion of the certainty factor in CALCRIM No. 315 were realized in this case. The result, according to appellant, was a due process violation mandating reversal.[4] We disagree.

---

"You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] . . . [¶] *How certain was the witness when he or she made an identification?*" (CALCRIM No. 315, italics added.)

[4] With his supplemental brief on remand, Anderson filed a petition for writ of habeas corpus in which he challenged trial counsel's effectiveness for failing to call an expert on eyewitness identification, failing to raise the issue of defective police procedures in obtaining the identifications, and failing to confront Rivas with numerous inconsistencies between his initial defective identification and his certain identification at trial, as well as other factors undermining Rivas's credibility. We have considered the habeas petition concurrently with our review on

3

We also decline appellant's invitation to revisit our conclusion in *Anderson I* that the trial court's error in limiting the impeachment of Rivas was harmless beyond a reasonable doubt.[5]  Accordingly, we vacate our prior opinion and reconsider the matter in light of *Lemcke*, *supra*, 11 Cal.5th 644.  We affirm the judgment of conviction and remand with directions that the trial court exercise its discretion with respect to the imposition of the firearm enhancement under section 12022.53.

## FACTUAL BACKGROUND

*The attempted murders*

On May 3, 2015, about 11:30 a.m., Tony Rivas parked his red Volkswagen in front of the driveway of the San Pedro Market, blocking the exit from the market's parking lot.  Rivas and his passenger, Carlos Manzur, went into the market to make a

---

remand, but because we are issuing an order to show cause in the habeas proceeding, we need not address petitioner's arguments on habeas in this opinion.

[5] Appellant also contended on appeal that:  (1) The trial court violated appellant's confrontation rights by preventing defense counsel from confronting Rivas with evidence he was giving false testimony and by admonishing Rivas outside the jury's presence regarding his comportment as a witness; and (2) The trial court's failure to instruct the jury on the lesser included offense of attempted voluntary manslaughter violated appellant's constitutional rights, requiring reversal because the error relieved the prosecution of the burden of proving each element beyond a reasonable doubt.  We reject these contentions, affirm appellant's conviction, and, in light of Senate Bill No. 620 (Stats. 2017, ch. 682, § 2), remand the matter to permit the trial court to exercise its discretion as to the formerly mandatory firearm enhancements imposed under section 12022.53.

purchase.  When Rivas and Manzur returned to their car, two women in a white Buick whose car was blocked from exiting the parking lot began yelling at Rivas.  The women insulted Rivas, calling him a "fucking Mexican"; Rivas responded, "Fucking nigger," and drove away.  The white Buick followed Rivas's car at a close distance as Rivas drove north on San Pedro Street.  When Rivas made a U-turn at 118th Street, the Buick did the same and continued behind Rivas as he proceeded south on San Pedro.

As they drove, Rivas and Manzur saw one of the women in the Buick speaking on a phone.  After a few turns, Rivas noticed a white truck behind his car in front of the Buick.  The truck followed the Volkswagen to 124th Street, where Rivas stopped near the middle of the road facing Avalon Boulevard.  The truck stopped on the passenger side about 8 to 13 feet behind Rivas's car.  Rivas testified that the truck was a full size, double cab Chevy pickup truck, which was taller than Rivas's car.

When the vehicles came to a stop on 124th Street, the driver of the truck yelled, "did you have a problem with my mom?" or words to that effect.  Rivas replied, "I don't have a problem with your mother.  I don't have a problem with you." The driver then brandished a chrome nine-millimeter handgun[6] and pointed it at the Volkswagen.  Rivas pleaded with the driver not to shoot, but as Rivas pulled his car slightly forward, the driver fired the gun through the rear passenger window of the Volkswagen.  The bullet broke the window, passed through the

---

[6] Police recovered seven .45-caliber bullet casings on 124th Street west of Avalon Boulevard.  Although the barrel widths differ, when viewed from the side a .45-caliber handgun and a nine-millimeter handgun appear virtually indistinguishable.

Volkswagen's driver's seat, and struck Rivas in the back, causing him to bleed profusely and lose feeling in his legs and feet.[7] The gun appeared to jam as the driver tried to fire a few more times.

The truck then pulled forward, made a U-turn at Avalon Boulevard and drove back toward Rivas's car. Rivas told Manzur he had been hit and to get out of the car. Manzur exited the vehicle and ran as several shots were fired in his direction. As Rivas sat in his car unable to move his legs, the driver of the truck fired twice more at the Volkswagen, striking the driver's side door.

*The shooting at the food truck*

Shirley Diaz Andrade was in her food truck parked on Avalon Boulevard at 124th Street when she heard a gunshot and saw a red car and a white pickup truck behind it on 124th Street. She saw the truck pull in front of the red car and make a U-turn. The driver of the truck held a gun outside the window and fired three more times at the red car. The shooter then pointed his gun toward the food truck and fired. Andrade dropped to the floor and heard a bullet hit the door of her truck.

*The investigation*

Andrade was unable to identify the driver of the truck, but described him as a Black male wearing a white sleeveless T-shirt. She described the truck as a white four-door Chevy Silverado pickup with a black towing apparatus on the rear. She memorized the last three digits of the truck's license plate (568).

---

[7] The bullet that lodged in Rivas's back damaged two of his spinal cord nerves. As a result, Rivas was unable to walk when he was discharged from the hospital, and at the time of trial nearly two years after the shooting he still had no feeling in his right leg, he needed crutches to walk, and he used a wheelchair.

Using the partial license plate number of the truck provided by Andrade, police located a white GMC pickup truck with the license plate 8X24568 that matched the description of the suspect vehicle.[8]  DMV records showed the truck registered to appellant, who lived next to the San Pedro Market on 119th Street.

Both Rivas and Manzur identified appellant in a six-pack photo array as the driver of the pickup truck who followed the red Volkswagen and shot at them.  Rivas and Manzur also identified appellant as the shooter at the preliminary hearing, in the first trial in October 2016, and at trial.

Surveillance video from the San Pedro Market before the shooting showed Rivas and the occupants of the Buick exchange words in the parking lot, Rivas's execution of a U-turn, and the Buick following the Volkswagen.  Another surveillance video from a different angle showed the Buick in the parking lot, the truck parked in front of appellant's house on the street, and appellant wearing a white sleeveless T-shirt speaking with the women in the Buick.  After the Buick could be seen driving toward San Pedro Street, the video showed appellant walking through the market parking lot talking on the phone, walking back from the San Pedro Street side of the market, running in the direction of his residence and the truck, and the truck driving away.  The video then showed the truck returning from the direction of San Pedro Street sometime later.

---

[8] Rivas, Manzur, and Andrade identified that truck as the vehicle used in the shooting.

*The jail phone calls*

At the preliminary hearing, Rivas testified that a woman had visited his home and told "him not to testify—or come to court." The woman was identified as Amanda Hegarty, whom appellant had called numerous times from jail between November 2015 and January, sometimes using another inmate's booking number to place the calls. Among other things, appellant and Hegarty discussed how Rivas might be persuaded not to testify that appellant was the shooter.

*The defense case*

Appellant testified. He admitted the truck belonged to him and agreed that he could be seen in the surveillance video walking across the San Pedro Market parking lot talking on the phone, but he denied driving the truck the morning of May 3, 2015, and he denied that he was the shooter. Rather, appellant explained that his friend Davion had borrowed the truck the night before, and after returning the next morning had driven it off again without permission.

On the morning of the shooting, Davion parked the truck in front of appellant's house, but sat in the vehicle for over an hour. Two women came to appellant's house to look at a Chevy Malibu appellant had for sale. Davion was still in the truck as appellant was showing the car to the women, who complained that Davion had not told them there was so much wrong with the car. The women left without purchasing the Malibu and walked back to the white Buick, which was parked in the San Pedro Market parking lot. Appellant followed the women to their car and gave them directions to another person in the neighborhood who sold Saturns for less than appellant was asking for the Malibu. As appellant was walking back in the direction of his house after the

8

women had left, he called the other car seller. In subsequent testimony appellant stated that as he was leaving the parking lot he was calling his friend, "O," who had recently had a heart attack.

Just as appellant ran back to his house Davion drove away in appellant's truck.

Rivas lived on 119th Street, a few houses down from appellant on the same side of the street. Rivas was known in the neighborhood as "Happy," and he and appellant were acquainted. Appellant testified that the purpose of the phone calls with Hegarty was to get Rivas to come to court so that Rivas would recognize that appellant was not the man who shot him.

## DISCUSSION

### I. The Exclusion of Rivas's Prior Inconsistent Testimony and the Trial Court's Admonition of Rivas Outside the Jury's Presence

Appellant contends the trial court violated his confrontation rights by preventing defense counsel from impeaching Rivas with prior inconsistent testimony from the preliminary hearing, which would have demonstrated Rivas was giving false testimony at trial. Although erroneous, we conclude the court's limitation on this impeachment was harmless beyond a reasonable doubt. Appellant further contends that by admonishing Rivas outside the jury's presence, the trial court improperly prevented the defense from demonstrating Rivas's hostile demeanor under questioning, thereby violating appellant's right to confront this key witness. However, having failed to object on this or any ground, appellant forfeited the claim.

9

**A.** *The erroneous limitation on the impeachment of Rivas was harmless beyond a reasonable doubt*

*1. Relevant background*

At the preliminary hearing the prosecutor asked Rivas what he saw when the white truck was stopped. Rivas responded, "I saw the gun. It got stuck and he was making it unstuck. I saw that he had the gun outside, and I thought it was a policeman and I thought he's gonna kill me." The court sustained defense counsel's objection that the testimony was nonresponsive and granted the request to strike it.

At trial Rivas denied testifying previously that he believed the shooter was a police officer, proclaiming, "No. No. I never said that. No. Why would I accuse him of being a police officer when he confronted me that if I had had a problem with his mother or with him? Why would I confuse someone that was going to kill me with a police officer? No. No. No." When defense counsel sought to impeach Rivas with his preliminary hearing testimony, the prosecutor requested a sidebar conference.

At sidebar the trial court observed, "It looks like that portion of the testimony was stricken." Defense counsel pointed out that the objection had been sustained because the testimony was nonresponsive. The trial court then ruled that defense counsel could ask Rivas if he had testified he thought the shooter was a police officer, but he could not refer to the preliminary hearing transcript because Rivas's answer had been stricken and "should have been struck from the record." The trial court explained, "If it's stricken, then you cannot refer to it. And I don't know exactly how the court reporter's supposed to do it. If it's stricken, it's supposed to be—not appear on the record in the transcript."

10

When cross-examination resumed, defense counsel asked Rivas, "Your testimony is you have never said in court that you thought the person who was shooting at you was a police officer?" The trial court then sustained the prosecutor's objection on the ground that the question had been "asked and answered."

*2. The trial court erred in preventing the defense from impeaching Rivas with his prior inconsistent statement, but the error was harmless beyond a reasonable doubt*

The trial court incorrectly reasoned that the portion of Rivas's preliminary hearing testimony which was stricken had ceased to exist and therefore could not be used for impeachment. To the contrary, although Rivas's statement was inadmissible for its truth as prior *testimony*, Rivas nevertheless spoke the words— "I thought it was a policeman and I thought he's gonna kill me"— and those words were admissible to impeach Rivas's trial testimony that he never made such a statement. (*People v. Corella* (2004) 122 Cal.App.4th 461, 470, 471 [witness's "words were stricken as testimony but continued to constitute her 'statement,'" admissible for impeachment].)

Assuming without deciding that the trial court's improper limitation on impeachment infringed appellant's confrontation rights, the error does not warrant reversal in this case.

" ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 395.) " 'The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully

realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 350, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.)

Applying these factors to the instant case, we find the court's error was harmless.

Rivas's testimony was central to the prosecution's case, and he was subjected to extensive cross-examination.  He was also impeached numerous times with prior inconsistent statements as well as with a prior conviction for possession of cocaine for sale in the 1980's.  Inconsistencies in Rivas's account of the incident, his willingness to deny giving testimony that plainly appeared on the record of prior proceedings, and Rivas's belligerence under cross-examination were on full display throughout Rivas's testimony.  In one such instance, after testifying that before May 3, 2015, he had seen appellant driving the white truck past his house, Rivas was impeached with his preliminary hearing testimony that he had never seen appellant or his truck before the day of the shooting.  Not only did Rivas contradict his prior testimony, but he denied ever making such a statement.  At other points Rivas was impeached with prior testimony about the sequence of events when Rivas exchanged insults with the women in the Buick,

when he first saw the white truck following him, and with prior testimony that he was never afraid because he was a "beast" and a "bad ass."

The prosecution presented fairly compelling evidence that appellant was the shooter. Apart from the excluded statement that he thought the shooter was a police officer, Rivas positively identified appellant as the shooter from a photo six-pack before trial, at the preliminary hearing, and at trial. Rivas's testimony was consistent with Manzur's, who also identified appellant as the shooter from a photo line-up before trial, at the preliminary hearing, and at trial. The evidence established that appellant owned the truck used in the shooting, and appellant, who could be seen on surveillance video wearing a white tank top, matched Andrade's description of the shooter as African-American and wearing a white sleeveless shirt. The surveillance video also showed appellant speaking to the two women in the Buick, walking through the market parking lot with a phone to his ear, and then running in the direction of his residence and truck. Immediately thereafter the truck could be seen driving away.

Finally, appellant testified that he was not the shooter, offering his friend Davion as the likely culprit. The jury was not required to accept appellant's account, however. Indeed, a rational trier of fact could disbelieve any portions of appellant's testimony that it deemed self-serving and draw any contrary inferences supported by the evidence. (*People v. Silva* (2001) 25 Cal.4th 345, 369; *People v. Ewing* (2016) 244 Cal.App.4th 359, 378; see *U.S. v. Selby* (9th Cir. 2009) 557 F.3d 968, 976 [" '[d]isbelief of a defendant's own testimony may provide at least a partial basis for a jury's conclusion that the opposite of the testimony is the truth' "].)

Under these circumstances, we conclude that the trial court's improper limitation on Rivas's impeachment to be harmless beyond a reasonable doubt. (*People v. Brown* (2003) 31 Cal.4th 518, 546.)

**B.** ***Appellant forfeited any claim based on the trial court's admonition of Rivas outside the presence of the jury***

*1. Relevant background*

Defense counsel's cross-examination of Rivas frequently elicited rambling nonresponsive answers and outbursts, prompting the court to admonish Rivas on multiple occasions. Finally, Rivas declared, "I don't even want to answer anymore because those questions are not worth it anymore." At this, the court promptly took a break and admonished Rivas outside the presence of the jury:

"You have been subpoenaed to testify as a witness whether you like it or not. And as a witness [the] only job you have is to answer the questions. You may not understand . . . why these questions are being asked. But that is not a reason for you to get frustrated or not answer the questions. . . . You have to answer the questions. [¶] And you're making it go longer and longer by trying to just say what you want to say instead of answering the questions. You need to answer the questions the attorneys are asking whether you like the question or not. [¶] . . . [¶] My observation is, when you don't like the question, you start saying something else. Or you're going ahead and trying to anticipate what the question is going to be. But that's not what you can do as a witness in the case." The court added, "I don't want to keep stopping you because I've already done it several times. I don't like to do that with a witness. Because I don't want the jurors to

14

have any—develop any opinions just because they see me interrupting you."

*2.  Because appellant did not object below the claim is forfeited*

Appellant did not object to the court admonishing Rivas outside the jury's presence at all, much less on the ground that the procedure violated his right to confrontation.  Hence, the claim is forfeited.  (*People v. Smith* (2001) 24 Cal.4th 849, 852 ["As a general rule, only 'claims properly raised and preserved by the parties are reviewable on appeal' "].)

## II.  The Trial Court Had No Sua Sponte Duty to Instruct on Attempted Voluntary Manslaughter Based on Heat of Passion

Appellant contends the trial court erred in omitting instruction on attempted voluntary manslaughter on the basis of its mistaken belief that attempted voluntary manslaughter is not a lesser included offense of attempted murder.  According to appellant, the trial court had a sua sponte duty to instruct the jury on attempted voluntary manslaughter based on heat of passion, and its failure to do so violated appellant's Sixth Amendment right to have the jury decide every element of the offense.  We disagree.

### A.  *The trial court's duty to instruct*

It is settled that in a criminal case, even absent a request, "a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.]  It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the

15

jury." (*People v. Booker* (2011) 51 Cal.4th 141, 181; *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

However, " '[a]n instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.' " *People v. Nelson* (2016) 1 Cal.5th 513, 538 (*Nelson*).) "The 'substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak' " ' " (*ibid.*), and "[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense" (*People v. Simon* (2016) 1 Cal.5th 98, 132). "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

## B. *Attempted voluntary manslaughter as a lesser included offense of attempted murder*

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.' (§ 187, subd. (a).) 'Manslaughter is the unlawful killing of a human being without malice.' (§ 192, subd. (a).) Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter. Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*Nelson, supra*, 1 Cal.5th at p. 538; *Breverman, supra*, 19 Cal.4th at p. 154.) Just as voluntary manslaughter is a lesser included offense of murder, so too is attempted voluntary manslaughter a lesser included offense of attempted murder. (*People v. Millbrook* (2014) 222 Cal.App.4th

1122, 1137 ["the offense of attempted murder is reduced to the lesser included offense of attempted voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion"]; see *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708–709.)

Our Supreme Court has explained: "A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) Legally sufficient provocation is that which " 'causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.' [Citation.] Further, the 'proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment.' " (*Nelson, supra*, 1 Cal.5th at p. 539.)

"For purposes of the heat of passion doctrine, 'provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment.' [Citation.] The standard requires more than evidence that a defendant's passions were aroused. The facts and circumstances must be ' "sufficient to arouse the passions of the ordinarily reasonable man." ' " (*Nelson, supra*, 1 Cal.5th at p. 539.)

As for the subjective element of voluntary manslaughter based on provocation, the high court has explained that the defendant "must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation."

17

(*Moye, supra*, 47 Cal.4th at p. 550; *Nelson, supra*, 1 Cal.5th at p. 539.)  The court has emphasized that "[i]t is not sufficient that a person 'is provoked and [then] *later* kills.' "  (*Nelson*, at p. 539.)  Rather, where " ' "sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter." ' "  (*Moye, supra*, 47 Cal.4th at p. 550, quoting *Breverman, supra*, 19 Cal.4th at p. 163.)

## C.  *Substantial evidence did not support instruction on attempted voluntary manslaughter in the present case*

Appellant's claim fails because there was insufficient evidence in this case to support either the objective or the subjective element of attempted voluntary manslaughter based on heat of passion.

Appellant argues that Rivas's use of the words "fucking nigger" during the verbal altercation with the two women in the Buick "might have easily provoked an ordinary reasonable [B]lack man in this neighborhood to act rashly and without deliberation, and from passion rather than judgment."  However, the objective standard is not the reaction of a reasonable Black man in appellant's neighborhood.  As our Supreme Court has long held in determining whether a provocation meets the objective standard for voluntary manslaughter, "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused."  (*People v. Logan* (1917) 175 Cal.45, 49 *People v. Cole* (2004) 33 Cal.4th 1158, 1215–1216 [same]; see also *People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*) ["standard is not the reaction of a 'reasonable gang member' "]; *People v. Gutierrez* (2002) 28 Cal.4th

18

1083, 1144 [passion for revenge will not reduce murder to manslaughter].)

In this regard, appellant's reliance on *People v. Millbrook*, *supra*, 222 Cal.App.4th 1122 is misplaced. There, the victim had been aggressive throughout the night of the party and had made threatening statements and engaged in shouting matches with other guests before arguing with the defendant. (*Id.* at p. 1141.) Immediately before the shooting, the victim escalated the fight with the defendant, and with his fists clenched, lunged at the defendant, who then shot him. (*Ibid.*) The appellate court held this evidence sufficient to permit a jury to conclude that a reasonable person in the defendant's position could have acted in the heat of passion, thus warranting instruction on voluntary manslaughter. (*Id.* at pp. 1141–1143.)

Here, by contrast, Rivas insulted two women outside of appellant's presence,[9] but did not threaten or engage in any physical violence. In such situations, our Supreme Court has repeatedly rejected arguments that insults "would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (*Enraca*, *supra*, 53 Cal.4th at p. 759; *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 (*Gutierrez*) ["a voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words"]; *People v. Avila* (2009) 46 Cal.4th 680, 706 [gang challenge insufficient provocation]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [name calling and taunting

---

[9] There is no evidence to support appellant's statement that either of these women was appellant's "loved one," much less the speculation that appellant might have witnessed the exchange.

defendant to use weapon insufficient provocation].)  In short, a provocation, " 'such as words of reproach, however grievous they may be, . . . is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter.' "  (*People v. Wells* (1938) 10 Cal.2d 610, 623.)

Not surprisingly, appellant does not even argue that the subjective component of heat of passion was satisfied here.  Not only was evidence completely lacking that appellant shot at Rivas and Manzur " 'while under "the actual influence of a strong passion" induced by [objectively sufficient] provocation' " (*Enraca*, *supra*, 53 Cal.4th at p. 759), but appellant's state of mind was never in issue or argued by the defense.  Indeed, appellant presented evidence completely at odds with a heat of passion defense:  he averred that he had never seen the women before, he refuted that either was a relative of his, he denied receiving a phone call from any woman telling him she had just been called a "nigger," and he categorically denied any knowledge of the altercation in the parking lot or any name-calling between Rivas and the women.  In short, appellant vehemently denied any involvement with the shooting, suggesting instead that his friend Davion had taken appellant's truck and shot Rivas.

In light of this defense, the only issue at trial on the attempted murder charges was appellant's identity as the shooter.  " 'A trial court need not, however, instruct on lesser included offenses when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime (for example, when the only issue at trial is the defendant's identity as the perpetrator).  Because in such a case "there is no evidence that the offense was less than that charged" [citation], the jury

20

need not be instructed on any lesser included offense.' " (*Gutierrez*, *supra*, 45 Cal.4th at pp. 825–826.)  As another court explained, "When defendant denied he shot the [victim], none of the alleged evidence of heat of passion . . . was of the type 'that a reasonable jury could find persuasive.'  [Citation.]  Simply stated, the duty to instruct on inconsistent defenses does not extend to cases such as this where the sworn testimony of the accused completely obviates any basis for finding a lesser included offense."  (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1021–1022; *People v. Gutierrez*, *supra*, 112 Cal.App.4th at p. 709 ["Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense"].)

## III. CALCRIM No. 315

On remand, appellant contends that the trial court's instruction that the jury consider the level of certainty in a witness's identification in assessing its accuracy violated appellant's due process rights because the instruction, along with the prosecutor's argument to the jury in this case, misdirected the jury to equate Rivas's certainty in his identification with accuracy.  Appellant maintains the error was prejudicial under either federal or state standards, particularly in light of the trial court's improper exclusion of Rivas's preliminary hearing testimony that Rivas had thought the shooter was a police officer.  Respondent counters that any error was harmless based on overwhelming evidence of appellant's guilt.

### A.  *The* Lemcke *decision*

In *Lemcke*, our Supreme Court acknowledged that "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally

an unreliable indicator of accuracy.' " (*Lemcke*, *supra*, 11 Cal.5th at p. 647.) However, the research also shows that " 'jurors . . . tend to overvalue the effect of . . . certainty . . . in determining the accuracy of eyewitness identifications.' " (*Id.* at p. 665.) The court noted that as currently worded, CALCRIM No. 315 does nothing to correct the common misconception that a witness's high degree of certainty in an identification correlates to accuracy. (*Id.* at pp. 647, 666.) Rather, by "merely directing the jury to consider a witness's level of certainty, without any further caveats, [the instruction] effectively operates to reinforce that misconception." (*Id.* at p. 666.) "This is especially problematic because many studies have also shown eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an identification." (*Id.* at p. 647.) And, as the court acknowledged, the danger of misleading jurors increases where the prosecution's case relies almost entirely on the testimony of a single witness who expresses a high degree of certainty in the identification. (*Id.* at p. 666.)

The Supreme Court also warned that "[t]he risk of juror confusion is heightened by the structure of CALCRIM No. 315, which lists witness certainty among numerous other factors the jury should consider when assessing the eyewitness testimony. As written, the instruction implies that each of these factors have a direct, linear bearing on accuracy. For instance, 'How well could the witness see the perpetrator' implicitly prompts the jury to believe that if the witness could see the perpetrator well, the identification should be given more weight, and vice versa; 'How closely was the witness paying attention,' 'Was the witness under stress when he or she made the observation,' 'Did the witness ever fail to identify the defendants,' all do the same. Hearing the

22

certainty instruction in this context increases the risk that the jury will infer certainty operates the same way—as having some direct relationship with the accuracy of the identification." (*Lemcke*, *supra*, 11 Cal.5th at p. 666.)

Despite the risks of allowing a jury to consider the level of an eyewitness's confidence to determine the accuracy of an identification, *Lemcke* noted that inclusion of the certainty factor in CALCRIM No. 315 does not, by itself, violate due process. (*Lemcke*, *supra*, 11 Cal.5th at pp. 646–647, 661.) A due process violation occurs only if the jury instruction—" ' "in the context of the instructions as a whole and the trial record" ' "— renders the defendant's trial fundamentally unfair, most often by lowering the prosecution's burden of proof. (*Id.* at pp. 647, 655, 661, quoting *People v. Foster* (2010) 50 Cal.4th 1301, 1335.) Our Supreme Court has long held that CALCRIM No. 315 (and its predecessor, CALJIC No. 2.92) does not violate due process because it "does not direct the jury that 'certainty equals accuracy.' " (*Lemcke*, at pp. 647, 655–657; see *People v. Sánchez* (2016) 63 Cal.4th 411, 462 (*Sánchez*).) Rather, "[t]he instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke*, at p. 657.)

The *Lemcke* court's examination of the record before it also revealed sufficient safeguards to prevent the jury from improperly inferring that a witness's certainty in making an identification ensures its accuracy. Our Supreme Court concluded, "when considered ' "in the context of the instructions as a whole and the trial record" ' [citation], . . . listing the witness's level of certainty as one of 15 factors the jury should

23

consider when evaluating an eyewitness identification did not render [defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Lemcke*, *supra*, 11 Cal.5th at p. 661.)

Despite the absence of a due process violation in the case before it, *Lemcke* nevertheless determined "there is a risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy." (*Lemcke*, *supra*, 11 Cal.5th at p. 669.) To avoid the risk that the current version of the instruction poses, the Supreme Court exercised its supervisory powers to direct California trial courts to omit the certainty factor from CALCRIM No. 315 until the language might be revised to minimize possible juror misdirection on this point. (*Ibid.*)

## B.   *Inclusion of the certainty factor did not violate appellant's due process rights*

*Lemcke*'s rejection of the defendant's due process claim was based on the presence of several safeguards that the court found effectively prevented the jury from improperly inferring the accuracy of an identification from a witness's certainty. These included: (1) The defendant in *Lemcke* presented expert witness testimony to rebut the misconception that certainty equals accuracy by casting grave doubt on the utility of confidence to assess accuracy, and labeling in-trial identification testimony as "particularly meaningless" (*Lemcke*, *supra*, 11 Cal.5th at p. 658); (2) other jury instructions given countered the possibility that CALCRIM No. 315 lowered the prosecution's burden of proof (*ibid.*); and (3) defense counsel had ample opportunity to cross-examine witnesses regarding the accuracy of the identification,

24

inconsistencies in other statements about the crime, and problematic aspects of the identification procedures the investigating officers used (*id.* at p. 660).

However, nothing in *Lemcke* suggests these elements are prerequisites to a fair trial in which identification is at issue, nor does the absence of any of these safeguards inevitably result in a due process violation. The defense did not present an eyewitness identification expert in this case, even though it could have. Nevertheless, appellant had a full and fair opportunity to test the reliability and accuracy of the eyewitness identification testimony through cross-examination. And defense counsel took full advantage of this opportunity, substantially impeaching Rivas's credibility and challenging the accuracy of the eyewitness identifications. The witness certainty factor in CALCRIM No. 315 did not impede the defense's ability to confront the eyewitness identification testimony, raise inconsistencies in Rivas's and Manzur's identifications, or point out deficiencies in the identification procedures used by police.

Moreover, as *Lemcke* emphasized, "the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony."[10] (*Lemcke, supra,* 11 Cal.5th at p. 657.) Here, many of those factors tended to seriously undermine Rivas's credibility and the accuracy of his identification, as defense counsel forcefully argued to the jury. In addition, not only did these factors cast doubt on the accuracy of Manzur's identification, but

[10] In this case, the certainty factor was one of 14 factors the court instructed the jury to consider.

the certainty factor itself allowed the defense to highlight the notable lack of certainty in Manzur's identification of the shooter in the photo lineup.

Our Supreme Court in *Lemcke* found that other instructions given in that case undermined defendant's argument that the certainty language lowered the prosecution's burden of proof and violated his due process rights by denying him a meaningful opportunity to present a complete defense. (*Lemcke*, *supra*, 11 Cal.5th at pp. 658, 660.) These included a general instruction on witness testimony that " '[p]eople sometimes honestly . . . make mistakes about what they remember' and that the jurors were responsible for 'judg[ing] the credibility or believability of the witnesses,' " the instruction that the defendant is presumed innocent, and that the prosecution had the burden of proving all elements of the crime including the identity of the perpetrator beyond a reasonable doubt. (*Id.* at p. 658.) These general instructions were given in this case, too, thus fully apprising the jury of its duties regarding assessment of a witness's credibility and the prosecutor's burden to prove guilt beyond a reasonable doubt. (*Lemcke*, *supra*, 11 Cal.5th at p. 658.) Moreover, CALCRIM No. 315 itself made this burden clear, instructing jurors that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

Jurors are presumed to have understood and correctly applied the trial court's instructions unless there is evidence of confusion or the jury requested further guidance on the issue at hand. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) Moreover, in addition to CALCRIM No. 315, the trial court read CALCRIM

26

No. 226, which, like CALCRIM No. 315, lists numerous factors (12) the jury may consider in evaluating the accuracy of witness testimony. The trial court also read CALCRIM No. 316, which informs the jury how evidence of a witness's prior felony conviction, crime or other misconduct may be considered in evaluating the witness's credibility. And in closing argument, the prosecutor urged the jury to review each of these instructions in evaluating the credibility and testimony of every witness. We find no indication in the record that these instructions confused or misled the jury, and the instructions taken as a whole do not support the conclusion that the jury was encouraged to give any more weight to the certainty factor than to any of the other 25 factors the jury was told to weigh.

The record as a whole shows that the inclusion of the certainty factor as one of 26 factors to be considered by the jury did not render the trial fundamentally unfair. Aside from Rivas's confident identification and Manzur's somewhat ambivalent one, there was abundant evidence strongly pointing to appellant as the shooter. Andrade identified the shooter as a Black man wearing a white tank top—a description that matched the person who could be seen walking across the market parking lot on the surveillance video shortly before the shooting. Appellant owned the truck used in the shooting and he conceded that he was the person in the video shown speaking to the two women in the Buick, walking with a phone to his ear, and then running toward his truck before it was driven away. Appellant also engaged in conduct that clearly indicated consciousness of guilt—he tried to recruit others to intimidate Rivas and he was caught in multiple lies. Further, the prosecution did not make Rivas's confidence in his identification of appellant the cornerstone of its entire case.

27

Although she twice highlighted Rivas's "100 percent positive . . . identification", the prosecutor elsewhere argued, "We have [Rivas]. We have [Manzur]. We have [Andrade]. We have the white truck. We have surveillance videos. We have jail calls. And we have the defendant's testimony because in this case defendant's testimony is evidence of guilt." Indeed, in rebuttal, the prosecutor went so far as to argue, "We didn't need the eyewitness testimony" in light of the "tons of circumstantial evidence," defendant's own statements, and the "direct evidence" of defendant's identity as the shooter.

In sum, when the single, short certainty factor is viewed in the context of the entire record, including all of the evidence, jury instructions, and arguments of counsel, we find no fundamental unfairness that deprived appellant of his due process rights or lessened the prosecution's burden of proof. (See *Lemcke, supra*, 11 Cal.5th at pp. 646–647.)

## IV. *Pitchess*

Prior to the first trial the trial court granted a defense motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), for a review of the personnel records of Detective Sanchez, the Spanish speaking detective who assisted and translated when Manzur was interviewed by police. Following an in camera review of the requested records to determine if they contained evidence of misconduct involving "misstating the evidence, preparing false police reports, lying, [or] untruthfulness," the trial court found no discoverable information.

Appellant asks this court to conduct an independent review of the in camera hearing on the *Pitchess* motion. Respondent contends that appellant forfeited the right to independent review

28

on appeal because he failed to renew his *Pitchess* motion before the second trial. However, assuming the request is not forfeited, respondent does not oppose an independent review by this court.

Because, as appellant points out, nothing in Detective Sanchez's personnel file had changed since the trial court found it contained no discoverable information, there was no basis for the defense to renew its *Pitchess* motion prior to the second trial, and no reasonable likelihood of a different outcome. To hold appellant forfeited appellate review of the *Pitchess* ruling in these circumstances would require an idle act by the defense and a pointless exercise by the trial court. The law does not require idle acts. (Civ. Code, § 3532; *People v. Financial Casualty & Surety, Inc.* (2016) 2 Cal.5th 35, 48.)

We have reviewed the sealed record of the in camera proceedings and conclude the trial court satisfied its obligations in determining whether the requested records contained discoverable information. No abuse of discretion occurred. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1225.)

## V. In Light of Senate Bill No. 620, the Matter Must Be Remanded to Enable the Trial Court to Exercise Its Discretion to Impose or Strike the Firearm Enhancements

The jury found true all five of the firearm enhancement allegations, and appellant's sentence includes a consecutive indeterminate term of 25 years to life under section 12022.53, subdivision (d) and a consecutive determinate term of 20 years pursuant to section 12022.53, subdivision (c). The parties agree that in light of Senate Bill No. 620, the matter must be remanded to allow the trial court to exercise its discretion as to these formerly mandatory firearm enhancements.

On October 11, 2017, the Governor signed Senate Bill No. 620. (2017–2018 Reg. Sess.) Previously, section 12022.53 required the imposition of specified sentencing enhancements based on a true finding that the defendant personally and intentionally discharged a firearm in the commission of a felony (§ 12022.53, subd. (c)) or personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). The trial court had no discretion to strike any applicable enhancement. (Former § 12022.53, subd. (h).) The legislation amends section 12022.53, subdivision (h) to remove the prohibition on striking a firearm enhancement and allows the court "in the interest of justice pursuant to Section 1385 and at the time of sentencing, [to] strike or dismiss an enhancement otherwise required to be imposed by this section." (Stats. 2017, ch. 682, § 2.)

Senate Bill No. 620 took effect on January 1, 2018, and the amendment to section 12022.53 applies retroactively to nonfinal judgments under the rule of *In re Estrada* (1965) 63 Cal.2d 740, 745. (*People v. Chavez* (2018) 22 Cal.App.5th 663, 712 ["amended section 12022.53, subdivision (h) applies to all nonfinal judgments"].) Therefore, because the judgment of conviction in appellant's case was not final when Senate Bill No. 620 took effect, appellant is entitled to the benefits of the amendments to section 12022.53.

At appellant's sentencing in this case, the trial court gave no indication whether it would strike the firearm enhancements had it been aware of any discretion to do so. In such instances, remand for a new sentencing hearing is required. (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110 ["[r]emand is required unless the record reveals a clear indication that the trial court

30

would not have reduced the sentence even if at the time of sentencing it had the discretion to do so"]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [same].)  Remand is therefore appropriate here to allow the trial court to exercise its discretion as to whether to strike or impose the firearm enhancements in accordance with section 12022.53, subdivision (h).

## DISPOSITION

The judgment of conviction is affirmed.  The matter is remanded with directions that the trial court exercise its discretion with respect to imposition of the firearm enhancement under Penal Code section 12022.53.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.

31